UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In Re: ) | |
| ) | |
| JOHN L. GEILER, JR., and ) | Case No. 05-51731-659 |
| KAREN ELISABETH DALE, ) | Judge Kathy A. Surratt-States |
| ) | Chapter 7 |
| Debtors. ) | |
| ) | |
| NICK BHAMBRI, and ) | **Adversary No. 05-4327-659** |
| MICHELLE BHAMBRI, ) | |
| ) | |
| Plaintiffs, ) | PUBLISHED |
| ) | |
| -v- ) | |
| ) | |
| ALLIED ENTERPRISES, LLC, ) | |
| GEORGE DAVID DOTHAGE, ) | |
| JOHN L. GEILER, JR., and ) | |
| KAREN ELIZABETH DOTHAGE, ) | |
| ) | |
| Defendants. ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The matters before the Court are Plaintiffs' Second Amended Complaint, the Defendants' Answers to the Second Amended Complaint, Defendants' Counterclaims and several pre-trial and post-trial motions. The Court conducted a four-day trial on the following dates: October 24, 2006, December 18, 2006, December 19, 2006, and February 8, 2007. Upon consideration of the record as a whole, the Court makes the following FINDINGS OF FACT:

Plaintiffs are Nick Bhambri (hereinafter "Nick") and his wife, Michelle Bhambri (hereinafter "Michelle") (hereinafter collectively "Bhambris"). Nick is the Director of Sales and Business Development for Monsanto Enviro-Chem Systems, Inc. (hereinafter "MECS"). In his position, Nick reviews commercial contracts and suggests potential contractual language to the legal department at MECS. Defendant Allied Enterprises, LLC (hereinafter "Allied") is a Missouri limited liability company in good standing with its principal place of business located in Jefferson County, Missouri. Defendant George David Dothage (hereinafter "Dave") is the manager and agent of Allied. Defendant Elizabeth Dothage (hereinafter "Liz") is the wife of Dave. Liz has signature authority on

Allied's bank account at Eagle Bank. Liz is the owner of Liz Dothage Insurance Agency (hereinafter "Liz Dothage Insurance"). Dave has signature authority on Liz Dothage Insurance's bank account at Eagle Bank. Liz Dothage Insurance is a separate and distinct legal entity from Allied. Defendant John L. Geiler, Jr. (hereinafter "Johnny") and his former wife, Karen E. Dale (hereinafter "Karen") filed a joint Chapter 7 bankruptcy petition on August 22, 2005. Johnny is neither a member, nor an owner of Allied. Furthermore, Johnny has no legal or equitable interest in Allied. Karen is the daughter of Dave and Liz Dothage. The Bhambris originally filed this case in Missouri State Court on January 15, 2005. The Bhambris removed it to the Bankruptcy Court on November 1, 2005. The Bankruptcy Court substantively consolidated this case with Case No. 05-4366-659 on January 20, 2006.

Nick and Michelle decided to make certain improvements to their home and hired an architect to make initial drawings of the project. Nick looked around for contractors and discovered Service Magic, an online service that specialized in connecting contractors with people who wanted repair or remodeling work done. Nick and Michelle posted their project on the website and waited for responses.

Shortly thereafter, Johnny received a lead from Service Magic and contacted the Bhambris to let them know of Allied's interest in the project. Sometime during the last weekend in January 2004, Dave and Johnny met with Nick and Michelle at the Bhambris' home to discuss the project and Allied's experience in home remodeling. Dave assured Nick and Michelle that Allied had plenty of experience in this area and that he would supervise the job. Dave and Johnny left the Bhambris' home to discuss the project and returned about a half an hour later. Based on their discussions, Allied, through Dave and Johnny, submitted a proposal for the project in early February 2004 for a price of $105,153.90 (hereinafter "Proposal 1"). The Bhambris rejected Proposal 1 because the price of the bid was too high.

The parties then discussed modifying the proposal in order to reduce the price. Several days later, Allied, through Dave and Johnny, submitted another bid for $81,808.58 (hereinafter

"Proposal 2"). The Bhambris rejected Proposal 2 because the price was still too high.

A day or two after the Bhambris rejected Proposal 2, Allied, through Dave and Johnny, submitted yet another bid for $64,578.00 (hereinafter "Proposal 3"). This proposal was close to what the Bhambris wanted to spend on the project. However, Nick was uncomfortable with some of the language contained in Proposal 3, so he offered to re-write the contract to make sure that the scope of the project was clear. Using his experience in commercial contracts, Nick wrote a contract between Allied and the Bhambris. On February 11, 2004, the Bhambris through Nick, and Allied through Johnny, executed a contract to complete the work for a price of $58,683.00 (hereinafter the "Allied Contract"). Dave was not present when Nick and Johnny entered into the Allied Contract. The Allied Contract called for the work to begin on or around February 15, 2004, and end no later than May 30, 2004. It also called for Allied to provide a written, binding warranty against defective workmanship for the life of the work.

Nick gave Johnny a check made payable to Allied in the amount of $30,000.00 as a down payment for the job. Johnny gave the check to Dave who endorsed it and deposited it in Allied's bank account at Eagle Bank. Dave then returned most of the money to Johnny, holding back a minor amount to pay an Allied bill that Johnny had incurred with a dumpster company. Neither Dave nor Johnny requested that the Bhambris issue a new check made payable to Johnny.

Throughout the negotiations, Nick repeatedly insisted that Allied have liability insurance before he would execute a contract. Both Dave and Johnny assured Nick that Allied carried necessary insurance. As a result, the parties included this understanding in a provision of the Allied Contract. It required Allied to carry fire, tornado, Workmen's Compensation and other necessary insurance. To comply with this provision, Allied requested a Certificate of Liability Insurance (hereinafter "Certificate of Insurance") issue through Liz Dothage Insurance. Dave routinely asked Liz to provide insurance documentation to Allied's customers through her insurance agency. In this case, Liz faxed the Certificate of Insurance to Nick on February 12, 2004, the day after Nick and Johnny executed the Allied Contract. The Certificate of Insurance listed Allied as the insured,

-3-

American States Insurance Company as the insurer and Nick as the certificate holder.

A couple of days after Nick and Johnny executed the Allied Contract, work on the project began. On February 20, 2004, Johnny applied for a construction permit through St. Louis County's Department of Public Works (hereinafter the "Application for Permit"). The Application for Permit generally described the scope of the project. It noted Allied as the builder and estimated the total construction cost for the project at $32,000.00, despite the contract price of nearly $58,683.00. This was done to accommodate Nick's request to lower the price, so that he would not have to pay additional property taxes. Nonetheless, Johnny signed the Application for Permit and certified, *inter alia*, that he was an agent authorized to apply for the permit on behalf of Allied. St. Louis County approved the Application for Permit on March 22, 2004.

During the course of the project, Nick and Michelle decided to change the scope of the work. They approached Johnny about it. Together, the Bhambris and Johnny completed five new agreements (hereinafter "Change Orders") over several months:

| Date | Amount |
|------|--------|
| 3/08/04 | $1,245.00 |
| 4/13/04 | 1,378.00 |
| 5/14/04 | 8,900.00 |
| 5/25/04 | 4,240.00 |
| 7/07/04 | 3,596.50 |

The Bhambris and Johnny used a form entitled "Additional Work Authorization" for the first four Change Orders. They used a form entitled "Bid Memo" for the last one. Johnny completed most of the additional contract work. However, he did not complete the work required of him by the change order of May 14, 2004. Consequently, the Bhambris held back the final payment of $2,500.00 due to Johnny when he completed the job. For each of these Change Orders, the Bhambris paid Johnny directly either through cash or a check. The Bhambris made the checks payable to Johnny. Allied did not receive any payment for this additional work.

The parties quickly developed a personal and professional relationship as the work on the Bhambri home progressed. Nick and Michelle would have meals with Johnny and Karen, and on one occasion, Nick and Johnny went to a casino together and discussed a potential business

-4-

opportunity. On February 10, 2004, one day prior to the execution of the Allied Contract, Nick sent an e-mail to Johnny outlining the various bids that Johnny gave him on his house and mentioning a potential opportunity. Nick placed a bid on a residential real estate project in Kirkwood, Missouri, and asked Johnny to consider becoming the general contractor of the project if Nick won the award. If this happened, Johnny would have had to give up his side business, but it would be more lucrative to him if he focused on the potential project that Nick proposed. As late as August 2, 2004, there was yet another business opportunity that Nick wanted to share with Johnny, so he sent a letter to him. This time the project was on Kehrs Mill Road in St. Louis County, Missouri. Johnny and Nick would be equal partners with another development company if the bid was successful. In both instances, Nick was aware that these projects were solely between him and Johnny and not Allied.

While Dave oversaw the project, Johnny handled the day-to-day assignments and Karen was a member of the crew. About three weeks into the project, Johnny had a problem excavating the yard. Nick asked Dave to assist Johnny with this part of the job and Dave complied. There were other problems over the next several months that the Bhambris observed and Dave's participation in the project increased as these problems arose. First, the roof had problems. It sagged and gave way as the crew walked on it. Second, there were problems with the siding. Third, the deck remained partially unfinished. Fourth, the sod on the yard and the Bhambris sprinkler system were damaged as a result of the excavation. Fifth, the foundation's walls were poured to grade and not to eight inches above grade as required by the drawings. Sixth, the framing did not match the drawings. Specifically, the drawings called for six-inch beams and the beams were only four-inch. Seventh, the basement was not finished. Eighth, there were problems with the electrical systems. Specifically, some of the electrical outlets in the Bhambri house did not work. In addition, there were phone jacks that did not work. Ninth, no insulation was put into the walls. Tenth, the tile on the kitchen walls was not installed. Eleventh, the garage was not finished. Twelfth, there were problems with the pool pipes leaking. Dave acknowledged all of these

problems and told the Bhambris that he would correct them.

In October 2004, the Bhambris asked Dave to work full-time on the job since they did not see any progress at their residence. Dave brought in a new crew, one that did not include Johnny. Dave attempted to correct some of the problems, but because he thought the Bhambris would sue him anyway, he stopped working on the project in November 2004. The Bhambris initiated legal proceedings in state court in January 2005.

## JURISDICTION AND VENUE

The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 151, 157, and 1334 (2005) and Local Rule 81-9.01(B) of the United States District Court for the Eastern District of Missouri. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) (2005). Venue is proper under 28 U.S.C. § 1409(a) (2005).

## CONCLUSIONS OF LAW

### A.    Count I – Breach of Contract (against Allied only)

In an action for breach of contract, a plaintiff must prove four elements. First, there needs to be a contract between the plaintiff and the defendant. Second, the plaintiff must have certain rights and the defendant must have certain duties under the contract. Third, the defendant must breach the contract. Fourth, the plaintiff must suffer damages as a result of the breach. *Taryen Dev. Inc. v. Phillips 66 Co.*, 31 S.W.3d 95, 104 (Mo. Ct. App. 2000).

The parties do not dispute the existence of a valid contract, nor do they dispute a breach of that contract since performance was still due when work ceased in November 2004.[1] The Bhambris further sustained damages as a result of the unfinished work. Rather, they disagree on the proper parties to the Allied Contract and the change orders. Therefore, the critical issue in Count I is whether or not Johnny had the authority to act on behalf of Allied when he signed the

---

[1] The Court notes that the Defendants raised a proverbial "eleventh hour" argument regarding the authenticity of Johnny's signature on the Allied Contract. Specifically, Karen testified that Johnny's signature was forged since he did not sign with his customary green ink pen above the signature line marked "Allied Enterprises L.L.C." The Court rejects this argument. Johnny testified that he signed the Allied Contract and the parties' actions further suggest that they agreed to the terms contained within it.

-6-

Allied Contract on February 11, 2004. For the reasons set forth below, the Court concludes that Johnny did have authority to act on behalf of Allied when he signed the Allied Contract. However, Johnny did not have authority to bind Allied to the change orders. The Bhambris and Johnny were the only parties to these additional agreements. Therefore, the Court will enter judgment in favor of the Bhambris and against Allied for breach of the Allied Contract in the amount of $30,000.00.

Agency is a fiduciary relationship between a principal and an agent whereby a principal gives consent to an agent for the agent to act on the principal's behalf. *Hardcore Concrete, LLC v. Fortner Ins. Servs. Inc.*, 220 S.W.3d 350, 354 (Mo. Ct. App. 2007). In this relationship, the agent's actions are subject to the principal's control and the agent's consent. *Id.* A principal is responsible for the acts and the agreements of its agent if they are within the agent's actual or apparent authority. *Dickinson v. Bankers Life & Casualty Co.*, 283 S.W.2d 658, 662 (Mo. Ct. App. 1955). "Actual authority may be express or implied." *Nichols v. Prudential Ins. Co. of America*, 851 S.W.2d 657, 661 (Mo. Ct. App. 1993). "Express authority is created when the principal explicitly tells the agent what to do." *Id.* "Implied authority consists of those powers incidental and necessary to carry out this express authority." *Id.* "Apparent authority is created by the conduct of the principal which causes a third person reasonably to believe that another has the authority to act for the principal." *Id.* The Nichols Court further explained:

> A finding of apparent authority requires evidence that a principal has communicated directly with the third party or has knowingly permitted its agent to exercise authority. Thus actual authority is created by the principal's manifestations to the agent, whereas apparent authority is created by the principal's manifestations to a third party.

*Nichols,* 851 S.W.2d at 661-662.

In this case, there is no question that Johnny had actual authority to execute a contract between Allied and the Bhambris as to Proposal 1, Proposal 2 and Proposal 3. Together, Dave and Johnny participated in the negotiations with the Bhambris, worked revisions to the proposals and

-7-

generally kept in close contact with each other about the status of the project. In like manner, Dave's actions with the Bhambris created apparent authority with Johnny as to the Allied Contract. Dave worked on the job throughout 2004. He responded to most of the Bhambris' concerns and he eventually ran the entire project. Most importantly, however, Dave deposited the $30,000.00 check made payable to Allied into Allied's bank account at Eagle Bank. This simple act legally bound Allied to the Allied Contract.

The Change Orders were different because the actions of the parties were different. While there was standard rudimentary language in the change orders that referenced the Allied Contract, all of the other information on the forms referred to agreements solely between the Bhambris and Johnny.[2] In addition, the parties' actions suggest that the Bhambris and Johnny were the only parties to the Change Orders. Johnny completed the additional work. Johnny received payment for his services. Allied was not a party to any of these contracts, and therefore, it did not breach them.[3]

In Missouri, a contractor is liable for the cost of repairing or correcting defects or for the diminution in value of the property as a result of the defective performance. *County Asphalt Paving Co., Inc. v. 1861 Group, Ltd.*, 851 S.W.2d. 577, 582 (Mo. Ct. App. 1993). The parties did not present evidence that the value of the Bhambri property diminished. Therefore, the measure of damages in this case is the cost of repairing or correcting the defects. Upon review of the evidence adduced at trial, including the summary report of expenses prepared by the Bhambris, the Court concludes that the appropriate amount of damages in this case is $30,000.00, the amount the Bhambris paid to Allied as a down payment to the Allied Contract. Therefore, the Court will enter judgment in favor of the Bhambris and against Allied as to Count I for breach of the Allied Contract in the amount of $30,000.00.

    B.    **Count II – Unjust Enrichment (against all of the Defendants)**

---

[2] This language was not included on the last change order entitled "Bid Memo."

[3] The Court notes that Johnny did not complete the work required of the Additional Work Authorization dated May 14, 2004. However, the Court does not have to reach a decision on this issue since Johnny is not a defendant to Count I of the Bhambris' Second Amended Complaint.

There are three elements to a claim of unjust enrichment in Missouri. First, a plaintiff must confer a benefit and enrich a defendant. Second, the enrichment must be at the expense of the plaintiff. Finally, the court must determine that it would be unjust for the defendant to retain the benefit. *Miller v. Horn*, 254 S.W.3d 920, 924 (Mo. Ct. App. 2008). "Mere receipt of benefits is not enough, absent a showing that it would be unjust for the defendant to retain the benefit." *Id.*

Here, the Bhambris conferred a benefit and enriched Allied by paying an amount of money for Allied to perform home improvements. Allied retained the money thus depriving the Bhambris of their funds. However, the Court concludes that the Defendants completed at least $30,000.00 worth of work on the Bhambri project. Moreover, the Bhambris failed to show that it would be unjust for the Defendants to retain the money that they earned. Therefore, the Court will enter judgment in favor of Defendants and against the Plaintiffs as to Count II.

**C.     Count III – Fraud (against all of the Defendants)**

To maintain an action for fraud, the Plaintiffs must allege and prove eight elements. First, a representation must be made. Second, the representation must be false. Third, the representation must be material. Fourth, the speaker must know that the representation is false or be ignorant of its truth. Fifth, the speaker must intend for the hearer to act upon the representation in the manner reasonably contemplated. Sixth, the hearer must be ignorant and not know that the representation is false. Seventh, the hearer must rely on the representation being true. Eighth, the hearer has a right to rely upon the representation; and ninth, the hearer's actions proximately caused the injury. *Heberer v. Shell Oil Co.*, 744 S.W.2d. 441, 443 (Mo. 1988). If a party fails to prove one of the elements of fraud, it destroys the claim in its entirety. *CADCO, Inc. v. Fleetwood Enters Inc.,* 220 S.W.3d 426, 436 (Mo. Ct. App. 2007).

Here, there was no intent on the part of the Defendants to fraudulently induce the Bhambris into signing the Allied Contract. Dave and Johnny simply made representations that they could perform the remodeling work when they ultimately could not. Mere "puffing" in the negotiation of a construction contract does not rise to the level of fraud. Since the Plaintiffs have not met their

burden of proving all of the elements of fraud, the entire action fails. Therefore, the Court will enter judgment in favor of Defendants and against the Plaintiffs as to Count III.

**D.     Count IV – Negligent Misrepresentation (against all of the Defendants)**

There are five elements to negligent misrepresentation. First, the speaker must supply some information in the course of business or other pecuniary interest. Second, the speaker must communicate false information through his failure to exercise reasonable care or competence in obtaining or communicating this information to others. Third, the speaker must intentionally provide this information for the guidance of a limited group of people in a particular business transaction. Fourth, the listener must justifiably rely on this information. Fifth, the listener must suffer a pecuniary loss as a result of his or her justifiable reliance. *Harris v. Smith*, 250 S.W.3d 804, 808 (Mo. Ct. App. 2008). Like fraud, it is fatal to the action if the plaintiff fails to prove any of the elements of negligent misrepresentation. *Id.* at 809.

Here, there was no evidence that the Defendants failed to use reasonable care or competence when they communicated the bids to the Bhambris. Dave and Johnny had prior experience in home remodeling. They developed several proposals based on their conversations with the Bhambris and they adjusted their proposals based on the Bhambris' needs and requests. The Court concludes that the Defendants' actions were reasonable, and thus, they did not commit negligent misrepresentation. Therefore, the Court will enter judgment in favor of Defendants and against the Plaintiffs as to Count IV.

**E.     Count V – Conversion (against all of the Defendants)**

There are three elements to maintain a conversion action. First, the plaintiff must own the property or be entitled to possess it. Second, the defendant must take possession of the property and intend to exercise some control over it. Third, by taking possession of the property, the defendant must deprive the plaintiff of the right to possession. *Mackey v. Goslee*, 244 S.W.3d 261, 264 (Mo. Ct. App. 2008).

Here, the Bhambris allege in their Second Amended Complaint that the Defendants took

several items of personal property including a shop vacuum, a pool pump, a pool electric timer, two 25-foot extension cords and miscellaneous small tools. Nick testified at trial that he simply could not find these items at his house. There was absolutely no evidence that the Defendants took these items. Therefore, the Court will enter judgment in favor of Defendants and against the Plaintiffs as to Count V.

**F.     Count VI – Violation of the Missouri Merchandising Act (against all of the Defendants)**

There are four elements for an action violating the Missouri Merchandising Act (hereinafter "MMA"). First, there must be a use or employment of a deception, a fraud, a false pretense, a false promise, a misrepresentation, an unfair practice, or a concealment, suppression or omission of a material fact. Second, the unlawful act must occur in connection with the sale or advertisement of any merchandise in trade or commerce. Third, the unlawful act must result in ascertainable loss of money or real or personal property. Fourth, the loss must occur to a person who purchases merchandise primarily for personal, family or household purposes. Mo. Ann. Stat. §§ 407.020, .025 (2000). The statute does not define deceptive practices in the statute. *State ex rel. Webster v. Areaco Inv. Co.*, 756 S.W.2d 633, 635 (Mo. Ct. App. 1988). The courts use a case-by-case analysis to determine what constitutes a deceptive practice. *Id.*

Here, there is no evidence that the Defendants made false promises to the Bhambris that would subject them to liability under the MMA. Dave and Johnny hoped to satisfy their end of the bargain and tried to correct the concerns that the Bhambris raised at various times during the project. While the Defendants failed to perform their duties under the Allied Contract, they did not utilize deceptive practices. Therefore, the Court will enter judgment in favor of Defendants and against the Plaintiffs as to Count VI.

**G.     Count VII – Alter Ego/Equitable Relief (against all of the Defendants)**

Piercing the corporate veil allows a court to disregard the corporate entity and hold its owners personally liable for the corporate debts. *Mobius Mgmt. Sys., Inc. v. W. Physician Search,*

*L.L.C.*, 175 S.W.3d 186, 188 (Mo. Ct. App. 2005).  There are three elements to pierce the corporate veil.  First, the plaintiff must first show that the defendant completely dominated the corporation in areas such as finance, policy and business practice.  In other words, the plaintiff must prove that the corporation is the alter ego of the defendant.  *Id.*  Second, the plaintiff must show a breach of duty. The plaintiff does this by showing that the defendant used control of "the corporation to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or to commit a dishonest and unjust act in contravention of plaintiff's rights."  *Id.*  The plaintiff does not need to prove actual fraud.  Sometimes, a court may pierce the corporate veil if a corporation is undercapitalized or when it strips its assets to avoid creditors.  *Id.* at 188-189.  Third, the plaintiff must prove "that the control and breach of duty proximately caused the injury or unjust loss."  *Id.* at 189

Here, Dave clearly controlled the finances, policy and business practices of Allied.  He oversaw the corporation's bank accounts, selected projects to submit bids and managed the onsite activities of his crews.  However, the Bhambris failed to show that the Defendants breached a duty to them.  The Court previously determined that the Defendants actions were not fraudulent. Further, there was no evidence that the Defendants failed to properly capitalize Allied, nor was there any evidence that the Defendants stripped Allied's assets to avoid its creditors.  Therefore, the Court will enter judgment in favor of Defendants and against the Plaintiffs as to Count VII.

**H.    Count VIII – Civil Conspiracy (against all of the Defendants)**

There are five elements to a civil conspiracy action in Missouri.  First, there must be two or more persons.  Second, there must be an object to be accomplished.  Third, there must be a meeting of the minds on the object or course of action.  Fourth, there must be one or more overt unlawful acts.  Fifth, the plaintiff must sustain damages as a result of the conspiracy.  *Dickey v. Johnson*, 532 S.W.2d 487, 502 (Mo. Ct. App. 1975).

Again, the facts of the case suggest that the Defendants merely could not complete a construction contract despite their efforts to do so.  Defendants' actions were not unlawful, except

for breaching the Allied Contract. They simply miscalculated what they could accomplish. Therefore, the Court will enter judgment in favor of Defendants and against Plaintiffs as to Count VIII.

By separate order, the Court will enter judgment in favor of Plaintiffs and against Defendant Allied in the amount of $30,000.00 as to Count I only. The Court will enter judgment in favor of Defendants and against Plaintiffs as to the remaining Counts. All other requests, including Defendants' Counterclaims, the parties' requests for attorney's fees and all pending matters, are denied.

                                                             */s/ Kathy A. Surratt-States*
                                                       KATHY A. SURRATT-STATES
                                                    United States Bankruptcy Judge

DATED: October 15, 2008
St. Louis, Missouri

Copies to:

Office of the United States Trustee
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Suite 6.353
St. Louis, MO 63102

Courtney M. Menges
Reinert & Rourke, P.C.
812 N. Collins, Laclede's Landing
St. Louis, MO 63102

Allied Enterprises, LLC
5632 Gravois
House Springs, Mo 63051

Donald Nagle
1935 Marconi
St. Louis, MO 63110

George David Dothage
6725 Martha Drive
Cedar Hill, MO 63061

Boris A. Kaupp
Reinert & Rourke, P.C.
812 N. Collins
Laclede's Landing
St. Louis, MO 63102

John W. Rourke, III
Reinert & Rourke, P.C.
812 N. Collins
Laclede's Landing
St. Louis, MO 63102

Arthur G. Muegler, Jr.
Law Offices of Arthur G. Muegler, Jr.
P.O. Box 230143
St. Louis, MO 63123

John Lee Geiler, Jr
5659 Mark Trail
House Springs, MO 63051